**UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
| --- | --- |
| IN RE VIATRIS INC. DERIVATIVE LITIGATION, | Lead Case No.: 2:23-cv-01446-MJH |
|  | **JURY TRIAL DEMANDED** |

<u>**VERIFIED CONSOLIDATED STOCKHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiffs Jacob Scheiner, Don Masters, and Portia McCollum ("Plaintiffs"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Viatris Inc. ("Viatris" or the "Company"), submit this Verified Consolidated Shareholder Derivative Complaint against individual defendants Scott A. Smith, Theodora Mistras, Melina Higgins, W. Don Cornwell, Joellen Lyons Dillon, Elisha Finney, Leo Groothuis, James Kilts, Mark W. Parrish, Richard A. Mark, Rogerio Vivaldi Coelho, Harry A. Korman, and Rajiv Malik, (collectively, the "Individual Defendants") for their breaches of fiduciary duties as directors and/or officers of Viatris from February 28, 2024 through the present (the "Relevant Period").

Plaintiffs allege the following based upon their own personal knowledge, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commissions ("SEC") filings, wire and press releases published by and regarding Viatris, news reports, securities analysts' reports and advisories about the Company, litigation documents involving the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

I.      **NATURE OF THE ACTION**

1.      This is a shareholder derivative action to remedy the violations of the federal securities laws and breaches of fiduciary duty committed by current and former members of the Board of Directors ("Board") of Viatris resulting in substantial damage to Viatris and its shareholders. It asserts: (1) federal securities laws claims and disclosure-based fiduciary duty claims tied to director reelections, executive compensation, and the 2020 Incentive Plan share increase; (2) a *Caremark* oversight claim for failure to implement and monitor quality/compliance systems at a mission-critical manufacturing site; (3) a *Brophy* insider-trading claim against the Insider Trading Defendant; and (4) corporate waste and unjust enrichment that spawned corporate harm, including remediation costs, regulatory restrictions, foregone 2025 revenue, litigation exposure and defense costs, reputational harm, and governance remediation expenses.

2.      Viatris is a global pharmaceutical manufacturer and distributor. It also offers support services such as diagnostic clinics, educational seminars, and digital tools.

3.      Viatris was created through the November 2020 merger between Mylan N.V. and Pfizer Inc.'s Upjohn division. In public filings after the Merger, the Company laid out a multi-phase transformation plan and touted its ability to deliver durable long-term growth by leveraging its differentiated business model, including both its biosimilars portfolio, *i.e.,* medicines highly similar to other marketed biologics, as well as its global generics franchise.

4.      A core component of Viatris' generics business prior to and during the Relevant Period was its manufacture, distribution, and sale of generic lenalidomide, the equivalent of Bristol-Myers Squibb's drug Revlimid, a cancer medication used to treat multiple myeloma, mantle cell lymphoma, and myelodysplastic syndromes. Due to patent-litigation settlement agreements that restricted the volume of lenalidomide generics through the end of 2025, the drug generated unusually high prices and margins for a generic product. As a consequence,

lenalidomide was among Viatris' most profitable products during the Relevant Period.

5. Viatris manufactured lenalidomide in Indore, India (the "Indore Facility") for global distribution, including the United States. Viatris' Chief Financial Officer ("CFO"), Theodora Mistras, described the Indore Facility as a vital component of the Company's international drug manufacturing operations, calling it "a global facility for us" that "services our network across the world."

6. However, in breach of their fiduciary duties, notwithstanding being faced with repeated red flags that the Company's Indore Facility was in serious violation of the United States Food and Drug Administration's ("FDA") current good manufacturing practice ("cGMP") regulations,[1] the Individual Defendants utterly failed to timely investigate and remediate the Company's lack of adequate corporate governance and protocols that were the root cause of the cGMP violations, failed to implement corporate controls and procedures to correct these serious manufacturing deficiencies, failed to monitor compliance with the Company's corporate controls and procedures, and all the while knowingly or recklessly concealed from shareholders the Company's non-compliance with cGMP at its Indore Facility.

7. The FDA conducted an on-site inspection of the Indore Facility between June 14 and June 26, 2024. That inspection revealed multiple safety and compliance failures, including failures to ensure reliability and integrity of quality control data, failures to investigate unexplained discrepancies in drug batches or failures of drug batches to meet specifications, failures to operate an effective quality system in accord with cGMP, and failures to ensure the accuracy and integrity of data to support safety, effectiveness, and quality of the drugs being manufactured.

---

[1] The cGMP violations included improperly cleaned ducts and testing equipment, fabricated quality control records, and out-of-specification test results that were not adequately investigated.

8.      Following the inspection, the FDA gave Viatris the opportunity to address these deficiencies. Rather than immediately implementing corporate controls and procedures to investigate and remediate the Company's serious manufacturing deficiencies identified by the FDA underlying the cGMP violations, the Individual Defendants utterly failed their fiduciary duties, continued to conceal the truth from shareholders, and presented the FDA with a response and remediation plan that the FDA determined was inadequate.

9.      In July 2024, the FDA issued a Warning Letter[2] explaining the deficiencies in Viatris' response and, simultaneously, imposed an Import Alert[3] barring impacted products from entering the United States. The Import Alert affected 11 products, including lenalidomide. Perhaps most significantly, the FDA expressed alarm that Viatris delayed meaningful remediation until after the FDA inspection, despite having been aware on its own of the issues pointed out by the FDA months earlier, stating that the "you did not adequately investigate or begin to implement holistic corrective actions until after the subsequent FDA inspection."

10.     When faced with these red flags, the Individual Defendants should have--but failed to--investigate and remediate the Company's lack of adequate corporate governance and protocols that were the root cause of the cGMP violations, and should have--but failed to--implement corporate controls and procedures to correct the serios manufacturing deficiencies identified by the FDA's inspection of the Indore Facility and resulting in the FDA's Warning letter. That the

---

[2] The FDA issues a Warning Letter when it identifies what it believes are significant violations of federal requirements. The Warning Letter identifies the concern(s), such as poor manufacturing practices, problems with claims for what a product can do, or incorrect directions for use, and provides an opportunity for the company or individual to address the FDA's concerns and requests a response within a certain timeframe. *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/about-warning-and-close-out-letters.

[3] Import Alerts are used to protect consumers against products with a history of known violations. The FDA can place a product on an Import Alert after discovering a violation, then detain future shipments of the product without having to test or otherwise physically examine it. *See* https://www.fda.gov/industry/actions-enforcement/import-alerts.

Indore Facility's quality systems deteriorated to the point of an FDA import ban indicates that Viatris either lacked an effective oversight system or that the Individual Defendants utterly disregarded their fiduciary duty to such controls amid escalating internal control failures.

11. In further breach of their fiduciary duty, on January 14, 2025, at the J.P. Morgan Healthcare Conference, when specifically asked about "headwinds" for the coming fiscal year relating to the Company's products and, specifically, its manufacture and sale of lenalidomide, the Individual Defendants falsely and misleadingly minimized the impact of the first-time disclosed FDA's Warning Letter and Import Alert on the Indore Facility as a "minor headwind" by stating: (i) that the Indore Facility was only a small part of the Company's manufacturing facilities; (ii) that the FDA's Indore Facility inspection was more than a half-a-year earlier; (iii) that the Company was in close communication with the FDA; (iv) that it received initial FDA feedback many months prior; (v) that it agreed to immediate remediation; (vi) that only 11 U.S. products were involved; (vii) that 4 of the 11 products were on an exempt list; (iix) that the Company would not discuss specific products manufactured at the facility; and (ix) that the Company was "in active discussions with the FDA to add more products to that exempt list," concealing the true scope of the FDA's action and its resulting revenue risk, including that adverse findings were communicated by the FDA's December 23, 2024 Warning Letter and Import Alert, that the Company's lenalidomide product was subject to the import ban, and that Viatris had neither obtained nor was realistically eligible for an exemption for lenalidomide from the import ban.

12. Moreover, during this very same period of time, Individual Defendant Malik breached his fiduciary duties by engaging in insider sales of Viatris common stock at artificially inflated prices, reaping proceeds exceeding $10 million.

13. The truth emerged on February 27, 2025, when Viatris reported its fourth-quarter and full-year 2024 financial results and issued guidance that materially missed expectations. The

Company attributed the miss to "the expected financial impact from [the] Indore facility warning letter and import alert."

14.     On the analyst earnings call that same day, the Individual Defendants disclosed key facts for the first time, including the timing of the FDA inspection, the status of remediation efforts, that lenalidomide was manufactured at the Indore Facility, that lenalidomide was subject to the import ban, and that the drug was ineligible for an exemption. The Individual Defendants also indicated that the FDA's Warning Letter and Import Alert would result in a $500 million reduction in revenue and a $385 million reduction in adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA").

15.     Following these disclosures, Viatris' stock price dropped sharply, falling from $11.24 per share on February 26, 2025 to $9.53 per share on February 27, 2025, a single day drop of approximately 15.21%.

16.     As a result, Viatris has suffered and will continue to suffer significant financial and reputational harm. The Company is now the subject of the Securities Class Action (defined below), has sustained lasting damage to its corporate reputation, has been forced to implement disruptive leadership changes at the Indore Facility, and faced an estimated $500 million reduction in 2025 revenue and a $385 million reduction in 2025 earnings attributable to the FDA Warning Letter and Import Alert.

17.     Plaintiffs did not make a demand on the Board. As detailed herein, a demand would be a futile and useless act. Demand is excused because a majority of the members of the Board are not independent, are not disinterested, and face a substantial likelihood of liability for the misconduct alleged herein.

## II.    __JURISDICTION AND VENUE__

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and under

Section 14(a) of the Exchange Act, 15 U.S.C. §§ 78n(a), and the rules promulgated thereunder by

the SEC, including Rule 14a-9, 17 C.F.R.§240.14a-9.

19.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant

to 28 U.S.C. § 1367(a).

20.    This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.

21.    This Court has personal jurisdiction over each defendant named herein because

each defendant is either a corporation that conducts business in and maintains operations in this

District or is an individual who has sufficient minimum contacts with this District to render the

exercise of jurisdiction by the courts of this District permissible under traditional notions of fair

play and substantial justice.

22.    In connection with the acts, conduct and other wrongs complained of herein,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

the United States mails, and the facilities of a national securities exchange.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. § 1391 because Viatris is headquartered in this District, Defendants

transact business in this District, and a substantial part of the events or omissions giving rise to the

claims occurred in this District.

## III.    PARTIES

### A. Plaintiffs

24.    Plaintiffs Jacob Scheiner, Don Masters, and Portia McCollum are current

shareholders of Viatris stock. They have continuously held Viatris common stock at all relevant

times.

7

### B. Nominal Defendant Viatris Inc.

25. Viatris is a Delaware corporation with its principal executive offices located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317. During the Relevant Period, Viatris common stock traded on the NASDAQ under the symbol "VTRS."

### C. The Individual Defendants

26. Defendant Scott A. Smith ("Smith") has served as Viatris' CEO since April 1, 2023 and has served as a Viatris Director since December 2022. Smith is also named as a Defendant in the Securities Class Action. According to a proxy statement filed on Schedule 14A with the SEC on October 24, 2025 (the "2025 Proxy"), during the 2024 fiscal year,[4] Defendant Smith received $14,759,379 in total compensation from the Company. As of the 2025 Proxy, Defendant Smith beneficially owned 314,807 shares of Viatris common stock, with a market value of approximately $3,245,660.17.[5]

27. Defendant Theodora Mistras ("Mistras") has served as Viatris' CFO since March 2024. Mistras is also named as a Defendant in the Securities Class Action. According to the 2025 Proxy, Defendant Mistras received $ 6,373,692 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Mistras beneficially owned 25,180 shares of Viatris common stock, with a market value of approximately $259,606.

28. Defendant Melina Higgins ("Higgins") has served as a Viatris Director since October 2020. Higgins also serves as Chair of the Board and Chair of the Board's Executive Committee and Finance Committee. According to the 2025 Proxy, Defendant Higgins received $670,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025

---

[4] "2024 fiscal year" refers to the fiscal year ended December 31, 2024.

[5] The 2025 Proxy reported beneficial ownership of Viatris common stock as of October 20, 2025. Valuation of the Individual Defendants' personal holdings of Company stock are based on the $10.31 per share closing price of Viatris common stock on that date.

Proxy, Defendant Higgins beneficially owned 1,952,132 shares of Viatris common stock, with a market value of approximately $20,126,481.

29.     Defendant W. Don Cornwell ("Cornwell") has served as a Viatris Director since 2020. Cornwell also serves as a member of the Board's Audit Committee and Compliance and Risk Oversight Committee. According to the 2025 Proxy, Defendant Cornwell received $395,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Cornwell beneficially owned 80,342 shares of Viatris common stock, with a market value of approximately $828,326.

30.     Defendant JoEllen Lyons Dillon ("Dillon") has served as a Viatris Director since 2020. Dillon also serves as Chair of the Board's Governance and Technology Committee and a member of the Board's Audit Committee and Compensation Committee. According to the 2025 Proxy, Dillon received $425,001 in total compensation from the Company during the 2024 fiscal year. As of the 2025 Proxy, Defendant Dillon beneficially owned 777,091 shares of Viatris common stock, with a market value of approximately $8,011,808.

31.     Defendant Elisha Finney ("Finney") has served as a Viatris Director since 2022. Finney also serves as a member of the Board's Audit Committee and Finance Committee. According to the 2025 Proxy, Finney received $395,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Finney beneficially owned 37,832 shares of Viatris common stock, with a market value of approximately $390,047.

32.     Defendant Leo Groothuis ("Groothuis") has served as a Viatris Director since May 2023. Groothuis also serves as a member of the Board's Compliance and Risk Oversight Committee, Executive Committee, and Governance and Sustainability Committee. According to the 2025 Proxy, Defendant Groothuis received $400,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Groothuis beneficially owned

9

39,907 shares of Viatris common stock, with a market value of approximately $411,441.

33.    Defendant James M. Kilts ("Kilts") has served as a Viatris Director since 2020. Kilts also serves as a member of the Board's Compensation Committee and Finance Committee. According to the 2025 Proxy, Defendant Kilts received $395,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 proxy, Defendant Kilts beneficially owned 136,422 shares of Viatris common stock, with a market value of approximately $1,406,511.

34.    Defendant Mark Parrish ("Parrish") has served as a Viatris Director since 2020. Parrish also serves as Chair of the Board's Compliance and Risk Oversight Committee, and as a member of the Board's Executive Committee, Governance and Sustainability Committee, and the Science and Technology Committee. According to the 2025 Proxy, Defendant Parrish received $475,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Parrish beneficially owned 140,395 shares of Viatris common stock, with a market value of approximately $1,447,472.

35.    Defendant Richard Mark ("Mark") has served as a Viatris Director since 2020. Mark also serves as Chair of the Audit Committee and a member of the Board's Compliance and Risk Oversight Committee, Executive Committee, and Finance Committee. According to the 2025 Proxy, Defendant Mark received $445,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Mark beneficially owned 91,310 shares of Viatris common stock, with a market value of approximately $941,406.

36.    Defendant Rogerio Vivaldi Coelho ("Coelho") has served as a Viatris Director since June 2024. Coelho also serves as a member of the Board's Compliance and Risk Oversight Committee and Science and Technology Committee. According to the 2025 Proxy, Defendant Coelho received $311,480 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Coelho beneficially owned 21,691 shares of Viatris common

stock, with a market value of approximately $223,634.

37.     Defendant Harry Korman ("Korman") served as a Viatris Director during the relevant period until his retirement at Viatris' December 5, 2025 Annual Meeting. During the Relevant Period, Korman served as Chair of the Compensation Committee, in addition to his service as a member of the Board's Compliance and Risk Oversight Committee, Governance and Sustainability Committee, and Science and Technology Committee. According to the 2025 Proxy, Defendant Korman received $400,001 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Korman beneficially owned 113,937 shares of Viatris common stock, with a market value of approximately $1,174,690.

38.     Defendant Rajiv Malik ("Malik") served as a Viatris Director during the Relevant Period until his retirement at Viatris' December 5, 2025 Annual Meeting. During the relevant period, Malik served as Chair of the Board's Science and Technology Committee. Malik also served as Viatris' President from November 2020 through April 2024. According to the 2025 Proxy, Defendant Malik received $375,787 in total compensation from the Company during the 2024 fiscal year. Also as of the 2025 Proxy, Defendant Malik beneficially owned 1,068,262 shares of Viatris common stock, with a market value of approximately $11,013,781. From the start of the Relevant Period through to the 2025 Proxy, Malik sold $10,643,805 worth of his personally held Viatris stock while in possession of material non-public information.

### D.  Demand Futility Non-Parties

39.     Non-Party Frank D'Amelio ("D'Amelio") has served as a Viatris Director since May 2025, and is named herein solely for the purposes of demand futility. D'Amelio also serves as a member of the Board's Compensation Committee and Finance Committee. According to a current report filed with the SEC on May 5, 2025 on Form 8-K (the "May 2025 Form 8-K"), D'Amelio participates in the Company's compensation program for non-employee directors.

11

40.     Non-Party Michael Severino, M.D. ("Severino") has served as a Viatris Director since May 2025, and is named herein solely for the purposes of demand futility. Severino also serves as a member of the Board's Audit Committee and Science and Technology Committee According to the May 2025 Form 8-K, Severino participates in the Company's compensation program for non-employee directors.

41.     Non-Party David Simmons ("Simmons") has served as a Viatris Director since August 2025, and is named herein solely for the purposes of demand futility. Simmons also serves as a member of the Board's Compensation Committee and Science and Technology Committee. According to the May 2025 Form 8-K, Simmons participates in the Company's compensation program for non-employee directors.

42.     Individual Defendants Higgins, Parrish, Cornwell, Dillon, Finney, Groothuis, Kilts, Mark, Smith, and Coelho, together with Non-Parties D'Amelio, Severino, and Simmons constitute the current makeup of Viatris' 13-member Board at the time of filing of this Verified Consolidated Shareholder Derivative Complaint.

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Background[6]

43.     Viatris is a global pharmaceutical company that supplies medicines to approximately 1 billion patients in more than 165 countries and territories through a worldwide manufacturing and distribution network that includes 26 manufacturing and packaging facilities.

44.     Viatris was formed in November 2020 through the merger of Mylan N.V. and Upjohn Inc., a legacy division of Pfizer Inc. In addition to its headquarters in Pennsylvania, Viatris

---

[6] As more fully set forth in the text, Plaintiffs plead both *Caremark* prongs: (i) failure to implement and maintain a board-level reporting system reasonably designed to monitor cGMP/data-integrity risks at the Indore Facility; and (ii) bad-faith failure to respond to multiple red flags (Jan 2024 internal awareness; June 2024 FDA observations; July 2024 inadequate response; Dec 2024 Warning Letter and Import Alert).

maintains significant operational centers in, among other locations, India and China, and manufactures drugs sold in the United States and other major markets at facilities outside the United States.

45.     One of Viatris's most important and profitable products immediately preceding and during the Relevant Period was lenalidomide, a generic version of Bristol-Myers Squibb's multiple-myeloma drug Revlimid. Although generic drugs typically face rapid price erosion, lenalidomide was subject to volume-restricted production agreements with Bristol-Myers Squibb that limited generic competition, resulting in unusually high margins for a generic product. As a result, lenalidomide became a key driver of Viatris's generics performance and a significant contributor to its revenues and profitability.

46.     Viatris manufactured lenalidomide at the Indore Facility for global distribution. Viatris' CFO, Defendant Mistras, described the Indore Facility as a vital component of the Company's international drug manufacturing operations, calling it "a global facility for us" that "services our network across the world." Defendants further portrayed all of the Company's manufacturing facilities as operating under full compliance with "exacting conditions governed by extensive regulation including strict in-process and finished pharmaceutical products specifications and controls," "subject to robust quality systems, standards and processes which are designed to ensure product quality and patient safety," and "executed in alignment with statutory and regulatory requirements, such as current Good Manufacturing Practices (cGMP)."

47.     While the Individual Defendants publicly emphasized the importance of lenalidomide to Viatris' generics portfolio and overall financial results, they did not disclose with specificity how much of its revenue and earnings were attributable to lenalidomide, nor did they disclose that lenalidomide was manufactured and packaged at the Company's Indore Facility.

48.     As a result, the Individual Defendants deprived investors of critical information

13

regarding both the Company's degree of financial dependence on lenalidomide and the operational risks associated with the facility responsible for producing one of Viatris's most economically significant products.

49. Moreover, the concentration of a high-margin, economically significant product at a single foreign manufacturing site was a matter that required heightened oversight by senior management and the Board, particularly with respect to quality controls, regulatory compliance, and disclosure.

**B. The Individual Defendants Knew or Should have Known that Viatris' Indore Facility Suffered from Significant Undisclosed Quality Deficiencies**

50. By the time of Viatris' formation, the Indore Facility already had a history of quality issues and violations of cGMP running back to at least October of 2019, when the FDA identified multiple violations of cGMP, including: (i) failure to comprehensively evaluate invalid laboratory investigations and implement adequate corrective actions to prevent recurrences; (ii) failure to thoroughly investigate repeated major complaints concerning tablet defects; (iii) failure to certify operators who visually inspected tablets in the packaging area; (iv) lack of adequate written procedures for visual inspection of tablets; and (v) failure to perform shipping studies for tablets meant for the U.S. market.

51. Then, in January of 2024, the Indore Facility again began experiencing significant quality-control and data-integrity failures that went well beyond isolated deviations or routine compliance observations. As later documented in a Warning Letter the FDA issued on December 19, 2024[7] (the "December Warning Letter"), personnel at the Indore Facility as well as Viatris's global quality organization were already aware of data-integrity issues relating to component

---

[7]https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/viatris-inc-690897-12192024.

testing and associated cGMP deficiencies by January of 2024. These issues implicated core elements of pharmaceutical manufacturing oversight, including the reliability of laboratory results and the integrity of records used to support product safety, quality, and regulatory compliance.

52. These significant quality and management control issues should not have been and were not confined to employees at the Indore Facility. They should have been and were escalated within Viatris's quality and management structure and were known, or should have been known, to senior leadership responsible for manufacturing oversight, regulatory compliance, and public disclosure.

53. Despite timely internal awareness, the Individual Defendants did not fulfill their fiduciary duties by undertaking a timely, comprehensive investigation into the scope and root causes of the deficiencies, nor did they implement holistic corrective actions designed to remediate the underlying control failures. Instead, the problems persisted for months while Viatris continued to manufacture and distribute products from the Indore Facility, including drugs destined for the United States market.

54. During this period, Viatris did not disclose the existence of these known data-integrity and quality failures to stockholders. Nor did the Company disclose that a facility responsible for manufacturing economically significant products was operating under unresolved compliance deficiencies that posed a foreseeable risk of regulatory enforcement.

55. As a result, throughout the early part of the Relevant Period, the Individual Investors breached their fiduciary duties of management and control oversight, failed to remediate known core control deficiencies, and failed to inform investors concerning the regulatory deficient conditions of the Indore Facility, the reliability of its quality systems, and the mounting risk that regulatory scrutiny would negatively impact the Company's ability to manufacture and import key products.

C. **The FDA's June 2024 Inspection Confirmed Systemic cGMP Deficiencies at the Indore Facility**

56.     Between June 14 and 26, 2024, the FDA conducted an inspection of the Indore Facility.

57.     The inspection occurred months after Viatris personnel and the Company's global quality organization had already become aware of data-integrity issues related to component testing at the facility. The inspection therefore did not uncover an isolated or newly arising problem; it provided regulatory confirmation of deficiencies that were already known internally.

58.     During the inspection, FDA investigators identified significant violations of cGMP reflecting a breakdown of the Indore Facility's quality-system controls. As later summarized in the FDA's December 19, 2024 Warning Letter, the Agency found, among other things, that Viatris had failed to establish and follow adequate written procedures applicable to its quality control unit; failed to thoroughly investigate unexplained discrepancies and batch failures; and failed to operate an effective quality system capable of ensuring the accuracy and integrity of data supporting the safety, effectiveness, and quality of the drugs manufactured at the facility.

59.     Critically, the FDA went on to conclude that Viatris's response to these findings reflected a broader failure of oversight rather than a prompt, good-faith remediation effort. The Warning Letter noted that although Viatris submitted responses and proposed corrective actions following the inspection, those measures were insufficient and did not demonstrate that the Company had adequately investigated the underlying causes of the data-integrity failures or implemented effective, holistic corrective actions. The FDA further expressed concern that Viatris delayed meaningful remediation until after the inspection, despite having been aware of the issues months earlier.

60.     The Warning Letter also confirmed that the Individual Defendants had been aware of serious issues at the Indore Facility as early as January 2024. Specifically, the Warning Letter

16

stated: "In subsequent communications, following the [June 2024] inspection, you disclosed that both your site and global quality organization became aware of the data integrity issues related to component testing in January 2024. FDA is concerned that you did not adequately investigate or begin to implement holistic corrective actions until after the subsequent FDA inspection."

61.    Along with the Warning Letter, in December 2024, the FDA issued an Import Alert in which the FDA prohibited the Company from importing into the United States most of the drugs it produced at the Indore Facility. Included in the list of drugs prohibited for import was lenalidomide.

62.    Given the sequence of events—including internal awareness of data-integrity issues beginning in January 2024, the confirmation of systemic deficiencies during the June 2024 inspection, and the Individual Defendants' breaches of fiduciary duty as exhibited by their abject failure to implement appropriate and verified remediation efforts at the Indore Facility upon becoming aware in January 2024 of the manufacturing discrepancies—the issuance of the Warning Letter and Import Alert was a foreseeable regulatory outcome.

63.    Furthermore, the Individual Defendants failed to timely and accurately disclose the scope and implications of the regulatory enforcement actions. Instead, the Individual Defendants minimized their significance and obscured the material impact they posed to Viatris's operations and financial performance.

### D.  The Individual Defendants Mislead the Public Into Believing Lenalidomide Would be Exempted from the Import Ban

64.    FDA policy permits drugs to be exempted from import bans when the drug is in short supply in the United States. This includes the availability of generic alternatives. Subsequent to the import ban, Viatris was able to exempt several drugs slated to be banned based on this policy.

65.    Further, after the import ban was disclosed, the Individual Defendants either

personally made, or allowed others to make public statements to the effect that the Company was attempting to have lenalidomide added to the exemption list. However, during the Relevant Period, there was no shortage of lenalidomide in the United States, nor was there any reason to believe that the import ban on Viatris' lenalidomide would create such a shortage. Specifically, (i) Viatris held a limited share of the total Revlimid/lenalidomide market, (ii) Bristol-Myers Squibb had the ability to supply virtually unlimited amounts of Revlimid, and (iii) multiple companies, other than Viatris, sold generic lenalidomide in the United States. As such, there was little if any chance that Viatris could successfully demonstrate the requisite shortage to get lenalidomide added to the exemption list.

66.    This predictable outcome would not come to public light, however, until February 27, 2025, when the Individual Defendants finally admitted that the FDA refused to include lenalidomide on the exemption list.

### E. The Individual Defendants Caused the Company to Issue Materially Misleading Statements

67.    Despite the Individual Defendants learning of the Indore Facility deficiencies in January 2024, again in June of 2024, after the FDA's inspection of the Indore Facility, again in July 2024, when the Company's responded to the FDA's findings, and, finally, in December 2024, when the FDA issued the December Warning Letter, the Individual Defendants only partially disclosed the existence of the FDA's inspection and subsequent actions.

68.    Not until December 2025 did the Individual Defendants disclose the full details of the FDA's action, the deficient and inadequate state of the Company's remediation, and the full extent to which the Import Alert would negatively impact the Company's finances, including with regard to lenalidomide.

69.    In fact, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties of good faith, due diligence and full candor by abjectly failing to implement

internal procedures and controls to address the deficiencies in the Indore Facility, and, furthermore, made, or allowed others to make, without meaningful intervention, numerous materially false and misleading statements and/or material omissions in that regard, concealing: (i) the nature of the significant health, safety, and operational issues at the Indore Facility; (ii) the existence and extent of the FDA's actions, (iii) the deficiencies and inadequacies of the Company's remediation plans; (iv) that lenalidomide had virtually no likelihood of being exempted from the import ban; and (v) the extent to which Viatris' financial performance would be negatively impacted as a result of the import ban. As a result, investors were given a false impression that the Company's financial prospects were better than they actually were.

70.     On February 28, 2024, the start of the Relevant Period, Viatris filed with the SEC its annual report on Form 10-K (the "2023 10-K") for the year ending December 31, 2023. The 2023 10-K was signed by Smith, Higgins, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, and Parrish.

71.     The 2023 10-K touted the Company's compliance process with respect to manufacturing-quality regulations, stating "[m]anufacturing is conducted under exacting conditions governed by extensive regulation including strict in-process and finished pharmaceutical products specifications and controls."

72.     The above statement in the 2023 10-K was materially false and misleading. Despite touting the Company's "exacting" manufacturing conditions and "strict . . . specifications and controls", the 2023 10-K misrepresented that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) that the Individual Defendants failed to adequately investigate or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection.

73.     Further, the 2023 10-K also promoted the Company's launch of lenalidomide in its product line-up stating "[n]ew product launches are an important growth driver," that "important recent launches include lenalidomide . . . in the U.S.," and that "[n]ew product sales, including lenalidomide . . . in the U.S  helped to partially offset the anticipated lower net sales of certain existing products . . . as a result of lower volumes and lower pricing due to additional competition."

74.     The statements in the 2023 10-K touting the lenalidomide launch were materially false and misleading because they omitted to state that the Indore Facility—where lenalidomide was produced—suffered significant quality issues and violations of cGMP, thus risking the integrity and marketability of this potentially lucrative drug.

75.     The 2023 10-K was also materially false and misleading because it described the risks relating to the 2019 quality controls and inspections at Viatris' facilities as being "in the past" or merely hypothetical, and touted the Company's commitment to regulatory compliance, despite the Individual Defendants' awareness of Viatris' cGMP current and ongoing violations at the Indore Facility and its vulnerability to an import ban, stating in part:

> Further, approved drugs, as well as their manufacturers, are subject to ongoing postmarketing review and inspection, which can lead to the discovery of previously unknown attributes of the products or the manufacturing or quality control procedures used in their production, which may impact the marketing of the products or result in restrictions on their manufacture, sale or use or in their withdrawal from the market. Any failure or delay by us . . . in obtaining and maintaining regulatory approvals could adversely affect the marketing of our products and our ability to receive product revenue . . . .
>
> *       *       *
>
> The pharmaceutical industry is subject to regulation by various governmental authorities in the jurisdictions in which we operate, including the U.S., EU, China and India. For instance, we must comply with applicable laws and requirements of the FDA and other regulatory agencies, including foreign authorities, with respect to the research, development, manufacture, quality, safety, effectiveness, approval, labeling, tracking, tracing, authentication, storage, record-keeping, reporting, pharmacovigilance, sale, distribution, import, export, marketing, advertising, and promotion of pharmaceutical products. We are committed to conducting our business, including the sale and marketing of our products, in compliance with all

applicable laws and regulations. These laws and regulations, however, are numerous, complex and continue to evolve, and it is possible that a governmental authority may challenge our activities, or that an employee or agent could violate these laws and regulations without our knowledge. Failure to comply with these laws, regulations or expectations could result in a range of consequences, including, but not limited to, . . . recall or seizure of products, total or partial suspension of production and/or distribution, [and] our inability to sell products . . .

*     *     *

The FDA and comparable foreign regulatory authorities also regulate the facilities and operational procedures that we use to manufacture our products. We must register our facilities with the FDA and similar regulators in other countries. Products must be manufactured in our facilities in accordance with cGMP or similar standards in each territory in which we manufacture. Compliance with such regulations and with our own quality standards requires substantial expenditures of time, money, and effort in multiple areas, including training of personnel, recordkeeping, production, and quality control and quality assurance. The FDA and other comparable regulatory authorities, including foreign authorities, periodically inspect our manufacturing facilities for compliance with cGMP or similar standards in the applicable territory. Regulatory approval to manufacture a drug is granted on a site-specific basis. Failure to comply with cGMP and other regulatory standards at one of our or our partners' or suppliers' manufacturing facilities could result in an adverse action brought by the FDA or other regulatory authorities, which has resulted and could in the future result in the receipt of an untitled or warning letter, . . . unanticipated compliance expenditures, . . . recall or seizure of products, total or partial suspension of production and/or distribution, our inability to sell products, the return by customers of our products, . . . refusal to permit import or export, . . . and/or other adverse actions.

Our business could be adversely affected if any regulatory body were to . . . require a recall or other adverse product action; require one of our manufacturing facilities to cease or limit production; or suspend, vary, or withdraw related marketing authorization. . . .

Although we have established internal quality and regulatory compliance programs and policies, there is no guarantee that these programs and policies, as currently designed, will meet regulatory agency standards in the future or will prevent instances of non-compliance with applicable laws and regulations. Additionally, despite our compliance efforts, we or our partners have in the past and may in the future receive notices of manufacturing and quality-related observations following inspections by regulatory authorities around the world, as well as official agency correspondence regarding compliance. If we are unable to resolve these observations and address regulatory concerns in a timely fashion, our business, financial condition, results of operations, cash flows, ability to pay dividends and/or stock price could be materially adversely affected.

76.     Further, the 2023 10-K discussed risks relating to quality deficiencies in the

manufacturing process, which the Individual Defendants again misleadingly described as being "in the past" or merely hypothetical, stating in part:

> A substantial portion of our capacity, as well as our current production, is attributable to a limited number of manufacturing facilities . . . . A significant disruption at any such facilities within our internal or third-party supply chain, even on a short-term basis, whether due to the failure of a third-party supplier to fulfill the terms of their agreement with us, labor disruption, adverse quality or compliance observation, other regulatory action, infringement of brand or other third-party intellectual property rights, natural disaster, civil or political unrest, export or import restrictions, or other events could impair our ability to produce and ship products to the market on a timely basis and could, among other consequences, subject us to exposure to claims from customers. Any of these events could have a material adverse effect on our reputation, business, financial condition, results of operations, cash flows, ability to pay dividends and/or stock price  If we or our third-party suppliers' face significant manufacturing issues, this could lead to shutdowns, delays or product shortages, or to our being entirely unable to supply certain products to customers for an extended period of time.

> *    *    *

> In addition, quality deficiencies in the products which we or our suppliers provide, or at our or their manufacturing facilities, have in the past and could in the future adversely impact our manufacturing and supply capabilities, [or] cause supply interruptions . . . .

> *    *    *

> In addition, the manufacture of some of our products is a highly exacting and complex process, due in part to strict regulatory requirements. Problems may arise during manufacturing at our or our third-party suppliers' facilities for a variety of reasons, including, among others, equipment malfunction, failure to follow specific protocols and procedures, problems with raw materials, natural disasters, power outages, labor disputes or other civil unrest, cybersecurity or compliance issues, and environmental, health and safety issues, laws, regulations and permits. If problems arise during the production of a batch of product, that batch of product may have to be discarded. This could, among other things, lead to increased costs, contractual penalties, lost revenue, damage to customer relations, time and expense spent investigating the cause, and, depending on the cause, similar losses with respect to other batches or products.

77.    The above statements regarding the risks related to regulatory compliance and manufacturing quality in the 2023 10-K were materially false and misleading because: (i) rather than being in the past or merely hypothetical, serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024;

22

(ii) the Individual Defendants had failed to adequately investigate, respond, or correct those issues; and (iii) the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection.

78.     On May 21, 2024, Viatris issued a document titled "Building Sustainable Access at Scale: Viatris 2024 Sustainability Report (the "2024 Sustainability Report"). The 2024 Sustainability Report provided assurances to investors that Viatris maintained robust quality control and complied with applicable cGMP regulations, stating in part:

> All of Viatris' operations [and] manufacturing sites . . . globally are subject to robust quality infrastructure and strategy. This infrastructure is comprised of the extensive experience and expertise of our personnel, our comprehensive Global Quality Policies that establish uniform requirements for fundamental process and controls within our Global Quality Management System (QMS), as well as Global Quality IT systems, which are implemented and designed to establish industry best practices, consistency and global quality assurance throughout our network.

> All of our operations are also subject to robust quality systems, standards and processes which are designed to ensure product quality and patient safety. These programs are designed and implemented across our global operations and are executed in alignment with statutory and regulatory requirements, such as current Good Manufacturing Practices (cGMP) . . . for all markets that they serve.

79.     The statements described above in the 2024 Sustainability Report, made by, or with the knowledge of the Individual Defendants, were materially false and misleading. Despite touting the Company's "robust" quality systems, standards, processes, and infrastructure, "in alignment" with cGMP, the Individual Defendants misleadingly omitted that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) the Individual Defendants failed to adequately investigate or correct those issues; and (iii) the FDA previously cited the Indore Facility for cGMP violations during a 2019 inspection.

80.     On August 8, 2024, Viatris filed with the SEC its quarterly report on Form 10-Q (the "2Q 2024 10-Q") for the second quarter of 2024. The 2Q 2024 10-Q portrayed the following

23

factors that *could* impact the Company's future financials: "Any changes in or difficulties with the Company's manufacturing facilities, including with respect to inspections, remediation and restructuring activities, supply chain or inventory or the ability to meet anticipated demand."

81.    Despite including this language, the 2Q 2024 10-Q was materially false and misleading because it failed to disclose that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) the Individual Defendants had failed to adequately investigate or correct those issues; and (iii) the FDA previously cited the Indore Facility for cGMP violations during a 2019 inspection. Nor was the FDA inspection disclosed during an earnings call held to discuss the Q2 2024 results.

82.    On November 7, 2024, Viatris filed with the SEC its quarterly report on Form 10-Q (the "3Q 2024 10-Q") for the third quarter of 2024. The 10-Q once again provided general risk disclosures stating that inspections and remediation activities could impact the Company's financials, stating in part:

> Any changes in or difficulties with the Company's manufacturing facilities, including with respect to inspections, remediation and restructuring activities, supply chain or inventory or the ability to meet anticipated demand.

83.    The 3Q 2024 10-Q was materially false and misleading because it once again failed to disclose that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring since at least January 2024; (ii) the Individual Defendants failed to adequately investigate or correct those issues; and (iii) the FDA previously cited the Indore Facility for cGMP violations during a 2019 inspection.

84.    On November 21, 2024, the Individual Defendants participated in the Jefferies London Healthcare Conference. During the conference, Defendant Smith downplayed the likelihood of any particular problem with any of the Company's products in any particular geography having a significant impact on the Company's financial results:

24

[Glen Santangelo, Jefferies Financial Group, Inc., Moderator]: This diversification issue, I think, remains underappreciated, right? Given that you're running those, that branded and that generics portfolio. No one product accounts for any meaningful share of your revenue and you're in 100-and-something countries and so no one country really represent – you're very diverse from a product and geographic perspective. So you don't really, I guess, worry too much about any one specific issue or maybe that's not the right characterization.

[Smith]: No, I think that's a good characterization, right? That 165 countries, 4,400 different products in different areas. It provides incredible base of stability for the company. On the other side of that, also we need to do things from a BD [*i.e.,* business development] perspective, which move the needle, right? And when you have $15 billion of diversified sales, there's some comfort and stability there. And as you said, not one product in any one geography really changes the needle. So we do have incredible stability. It's our ability then to add to that stability with new products and new revenue that's going to really create a growth profile for the future.

85.    Smith's statements were materially false and misleading because he and the Individual Defendants were aware that lenalidomide was "one product" with "one specific issue" in "one geography" that was highly likely to have a significant adverse impact on the Company's financial results. Further, due to the issues uncovered by the FDA at the Indore Facility months before, in June 2024, the Individual Defendants were aware that there was a high likelihood that the importation of lenalidomide in the United States would be barred, with no realistic prospect of an exemption from the FDA. When the statements were made, the Individual Defendants were also aware that due to the importance of lenalidomide to the Company's revenue, an import ban on the product would have a significant adverse impact on the Company's financial results for 2025.

86.    During the Jefferies London conference, Defendants Mistras and Smith were also questioned about financial forecasts going into 2025 in the following exchange:

[Glen Santangelo, Jefferies Financial Group, Inc., Moderator]: And Doretta, I know you're not going to give me any 2025 guidance here today, but I'm going to push a little bit, right? And so the obvious question would be, as we segue the conversation to 2025, based on all the previous answers, it feels like a lot of the trends that we've seen year to date continue to be in place   I think Corinne [Le Goff] mentioned that generic pricing is sort of stable. And so when we think

about what we've seen in 2024, is that a reasonable baseline for us to start to think about 2025? Or is there anything else that you'd call out specifically that we should have on our radar screen?

[Mistras]: No, I think it is. As we've mentioned, this is the sixth consecutive quarter that we've seen of operational revenue growth, and we expect to see that momentum to continue into next year. And it's really two factors that give us that confidence. Number one, it's what we've talked about, the kind of stability that we've kind of seen in the base business and then compounded by the $450 million to $550 million of new product revenue that we kind of anticipate to be able to deliver on. So the combination of those factors is what continues to give us the momentum that we expect to see as we go into next year.

*    *    *

[Smith]: I think the company is significantly undervalued at where we sit today. I think what's underappreciated is the stability of the base business and the fact that the base business has actually returned to growth.

87.    Mistras' and Smith's statements were materially false and misleading. Mistras' representation that the "stability . . . seen in the base business and then compounded by the $450 million to $550 million of new product revenue that we kind of anticipate to be able to deliver on . . . continues to give us the momentum that we expect to see as we go into next year" was demonstrably false and misleading given his and the Individual Defendants knowledge of the serious quality control issues and cGMP violations identified by the FDA at the Indore Facility, which were actively occurring and had been occurring since at least January 2024, and which were highly likely to negatively impact Viatris' ability to maintain its revenue and profit levels derived from lenalidomide in 2024.

88.    Similarly, Smith's representation that "the company is significantly undervalued at where we sit today. I think what's underappreciated is the stability of the base business and the fact that the base business has actually returned to growth" was demonstrably false and misleading given his and the Individual Defendants knowledge of the serious quality control issues and cGMP violations identified by the FDA at the Indore Facility, which were actively occurring and had been occurring since at least January 2024, and which were highly likely to negatively impact

26

Viatris' ability to maintain its revenue and profit levels derived from lenalidomide in 2024.

89.    On December 23, 2024, Viatris issued a press release disclosing, for the first time, the FDA inspection at the Indore Facility. The press release disclosed that the FDA had issued a Warning Letter following a failed inspection at the facility, stating: "Following an inspection by the U.S. FDA at our oral finished dose manufacturing facility in Indore, India earlier this year, the Agency has issued a warning letter, and an Import Alert related to this facility."

90.    The press release further noted that the Import Alert "affects 11 actively distributed products that will no longer be accepted into the U.S. until the Warning Letter is lifted" but that there were "four products" excepted from the Warning Letter based "on shortage concerns," and further that "[t]here could be potential for additional exceptions based on further discussions with the Agency."

91.    Finally, the press release disclosed that the Company had been implementing ongoing remediation efforts at the facility since Viatris first learned of the inspection results at an undisclosed time earlier in the year but that there would be no impact to the current-year's financials, stating in part:

> Following the substance of FDA's original inspection observations, we immediately implemented a comprehensive remediation plan at the site. The necessary corrective and preventative actions are well underway, including but not limited to related personnel actions. Additionally we have engaged independent third-party subject matter experts to support the remediation plan.
>
> *            *            *
>
> At this time, we do not anticipate these actions impacting our current 2024 guidance ranges. We will incorporate potential future financial impact in our 2025 guidance ranges when we provide these in early 2025.

92.    The foregoing statements were materially false and misleading for several reasons.. *First*, the press release failed to disclose that the Company had already attempted to implement remediation measures that were rejected by the FDA. *Second*, the press release failed to disclose

that lenalidomide was produced at the Indore Facility and that it was one of the drugs impacted by the Import Alert. *Third*, the press release failed to disclose that there was no realistic chance that an exemption for lenalidomide would be forthcoming from the FDA because there was no shortage lenalidomide in the United States. *Fourth*, given the impact that a ban on lenalidomide would have on the Company's revenues, the press release was false and misleading because the Import Alert ban on lenalidomide was in fact substantially likely to negatively impact the Company's 2024 guidance.

93.    On January 14, 2025, Viatris presented at the J.P. Morgan Healthcare Conference. During the Company's presentation, Defendants Smith and Mistras attempted to downplay the impact of the FDA Warning Letter on the Company's financials, engaging in the following interaction:

> [Christopher Thomas Schott – JPMorgan Chase & Co.]: Maybe one last bigger picture one. Just—I know, you're not giving formal guidance for 2025. But just headwinds and tailwinds, what are the things we should watch for as we go for this year?
>
> [Smith]: So headwinds and tailwinds. So just 1 thing, and I'll let Doretta take on the headwinds and tailwinds from finance perspective. One of the things that was announced was an Import Alert from our facility in Indore, and she will address that, I think, a little bit as a headwind for us. And I just wanted to say before she gets into the headwinds and tailwinds. So we take it very seriously.
>
> The Indore facility is 1 of 26 manufacturing facilities. It's an important facility within our global network. It's focused on oral solid doses. The Warning Letter and Import Alert are a result of an inspection which happened about 8 months ago. And we're in close communication with the FDA and receiving initial FDA feedback some months ago.
>
> When we got that feedback, we agreed to immediate remediation at that time of the issues that they had. And the Import Alert involves 11 products in the U.S., however, 4 products of the 11 are on an exempt list, and we're in active discussions with the FDA to add more products to that exempt list. So that was one of the things and Doretta go into it a little bit more to provide a little bit of a headwind for us as we move into 2025.
>
> [Mistras]: Yeah. Just to give some additional color regarding our headwinds and our tailwinds. There are some pushes and pulls as to consider as we think about

2025. . . .

From a headwind perspective, as Scott mentioned, specifically with respect to Indore, currently, we're having ongoing discussions, both with the FDA as well as current customers. And so we're not in a position right now to disclose specific products, and we're continuing to assess the potential impact from Indore. . . .

[Christopher Thomas Schott]: I know the specific products aren't disclosed and you're still working on it. Just any – just to quantify just how big is this facility from a revenue perspective?

[Mistras]: So as Scott – it's 1 of 26 facilities. It's an oral dose manufacturing facility. It services our network across the world. So it's a global facility for us as it relates to Indore.

*    *    *

[Chris Schott, JPMorgan, Analyst]: Maybe just one specific generic product. Generic Revlimid, how big of a tailwind has that been for you? And do we have to think about that as a headwind at some point as we look out to 2026 and beyond? [Corinne Le Goff, Viatris Inc., Chief Commercial Officer]: So generic Revlimid has been like a stable component of our generic portfolio.

94.    The foregoing statements were materially false and misleading when made because these statements failed to disclose the panoply of events that occurred at the Indore Facility, including that: (i) serious quality control issues and cGMP violations at the Indore Facility were actively occurring and had been occurring for years; (ii) that the FDA had previously cited the Indore Facility for cGMP violations during a 2019 inspection; (iii) lenalidomide was produced at the Indore Facility and was subject to the import ban; (iv) Viatris was not likely to secure exception to lenalidomide on the import ban list; (v) obfuscated the significance of the products included in the import ban (particularly with regard to lenalidomide); and (vi) that the Warning Letter and resulting Import Alert would negatively impact on the Company's finances.

95.    As a result of these misstatements and omissions, made by or with the knowledge of the Individual Defendants, investors were deprived of material information necessary to understand the full extent to which the Company's valuable operations were being impacted by the adverse FDA action.

29

**F. The Materially False and Misleading Proxy Statement**

96. On October 25, 2024, Viatris filed with the SEC its 2024 Proxy Statement on Form DEF 14A (the "2024 Proxy Statement"). The 2024 Proxy Statement was solicited by Cornwell, Dillon, Finney, Groothuis, Higgins, Kilts, Korman, Malik, Mark, Parrish, Smith, and Coelho. Despite the fact that the FDA inspection occurred between June 14 and 26, 2024, that Company's response issued in July 2024 was rejected by the FDA, that lenalidomide was produced at the Indore Facility and that it was one of the drugs impacted by the Import Alert, that that there was no realistic chance that an exemption for lenalidomide would be forthcoming from the FDA because there was no shortage lenalidomide in the United States, that a ban on lenalidomide would substantially negatively impact the Company's revenues, and that the Import Alert ban on lenalidomide was in fact substantially likely to negatively impact the Company's guidance..

97. The 2024 Proxy Statement did include a variety of statements touting the Company's product quality, shareholder engagement, and its systems of oversight and governance. Under the heading "Quality and Safety" the 2024 Proxy stated:

> Our global operations are supported by companywide quality systems, standards and processes which are designed to ensure product quality and patient safety. From product development to making or sourcing raw materials to producing finished dosage forms, every step of our development, manufacturing and monitoring processes is grounded in our commitment to good manufacturing practices and the quality and safety of our products.

98. With respect to shareholder engagement, the 2024 Proxy Statement touted its "shareholder-centric model . . . rooted in [Viatris'] Board of Director's . . . and management's commitment to on-going, robust dialogue with shareholders to discuss and solicit shareholder feedback on key strategic operation, financial, governance, and executive compensation topics, and to address other topics of importance to shareholders."

99. Under the section titled "Risk Oversight," the 2024 Proxy Statement included the following language:

30

Viatris operates in a complex and rapidly changing environment that involves many potential risks. In addition to general market, industry, R&D, supply chain, political, financial, and economic risks, the Company faces potential risks related to, among others, executing on and implementing our strategic objectives, including. . . legal, regulatory and compliance requirements and developments; the global nature of our operations; human capital management; environmental and social responsibility; and product portfolio and commercialization, among others. As a company committed to operating ethically and with integrity, we proactively seek to manage and, where possible, mitigate risks to help ensure compliance with applicable rules and regulations, maintain integrity and continuity in our operations and business, including in support of achieving strategic priorities and long-term financial and operational performance, and protect our assets (financial, intellectual property, and information, among others). Risk management is an enterprise-wide objective and is subject to oversight by the Board and its committees.

It is the responsibility of Viatris' management and employees to identify material risks to our business and to implement and administer risk management and mitigation processes and programs, while also maintaining reasonable flexibility in how we operate. Our internal audit function coordinates cross functionally to update the Company's enterprise risk assessment, including the identification of key and emerging risks, and reviews and refreshes this analysis quarterly with executive management. For each key or emerging risk identified, the Company establishes risk monitoring ownership from which quarterly updates are collected for executive management and the Compliance and Risk Oversight Committee. . . . To further embed risk management and compliance into our culture, Viatris has a robust global corporate compliance program, implements comprehensive policies and procedures, trains employees on how to implement and comply with them, and maintains an extensive program of oversight and audit to help ensure compliance and appropriate enterprise risk management.

The Company's risk oversight framework also aligns with our Disclosure Controls and Procedures. For example, the Company's Disclosure Committee reviews the Company's quarterly and annual financial statements and related disclosures. The Disclosure Committee consists of senior management including our CFO, Chief Legal Officer, Corporate Controller, Chief Corporate Affairs Officer, Head of Capital Markets, and General Counsel—Corporate Securities and Transactions, all of whom participate in the associated risk assessment as described above. The financial statements are also reviewed with the CEO before being reviewed with and approved by the Audit Committee, and filed with the SEC.

The Board directly, or through its committees, oversees the implementation of risk management and mitigation processes. The Board and its committees rigorously review with management the risk management program and discuss risk assessment matters at least quarterly, as well as during the Board's annual budget review and approval process. Each of our Board committees has full access to officers and employees of the Company, and the Board and committees also meet without members of management present. The Board and committee Chairs periodically discuss the allocation of specific risk oversight matters between the various Board

committees and the Board believes that its current risk oversight structure . . . assigns particular risk oversight matters to the Board committees that have the appropriate expertise to manage them. The Board also has the authority to form special strategic committees if it believes that it would be advisable to oversee significant strategic or other corporate actions, including the risks related thereto.

100.   The 2024 Proxy Statement also solicited shareholder approval of, among other things, the reelection of directors Cornwell, Dillon, Finney, Higgins, Kilts, Groothuis, Korman, Malik, Mark, Parrish, Smith, and Coelho to the Board, approval of lucrative executive compensation, and a 49,000,000 increase in the number of shares available for issuance under the Company's 2020 Incentive Plan.

101.   By touting Viatris' "companywide quality systems, standards and processes which are designed to ensure product quality and patient safety," the Individual Defendants gave the impression that the Company was being operated effectively.

102.   Yet, despite these positive proclamations, the Individual Defendants failed to provide any information in the 2024 Proxy Statement that would have warned investors that: (i) the Indore Facility had been suffering from significant health, safety, and operational issues well before the FDA's June 2024 inspection; (ii) the Company had already been the subject of a significant FDA inspection; (iii) that inspection had resulted in the discovery of the multiple health, safety and operational failures at one of the Company's key manufacturing facilities; (iv) that the FDA had found Viatris' responses and proposed remediations to those findings lacking; and (iv) that the FDA findings could pose a material negative risk to the Company's operations and revenue—including a potential risk to its lenalidomide business.

103.   This was vital information that would have provided timely and material context to the pronouncements in the 2024 Proxy Statement regarding the Company's risk oversight and internal controls and Viatris' overall prospects. By speaking on the Company's acumen without providing the full picture, the Individual Defendants provided misleading statements and omitted

32

material facts in the 2024 Proxy Statement.

104.    Additionally, by promoting the Board's system of controls and procedures with regard to risk oversight without also disclosing that the Company was suffering from simultaneous significant internal control deficiencies—both from the perspective of managing global operations and ensuring the Company was disclosing accurate information to the public—the Individual Defendants omitted vital information from the 2024 Proxy Statement that an investor would find material when assessing the Board's ability to effectively oversee the Company.

105.    By soliciting votes for, among other things, the re-election of directors, an executive compensation package, and amendments to the Company's incentive plan utilizing a proxy statement that contained material misleading information and omissions, the Individual Defendants deprived voting stockholders of vital, material information that would be necessary to make an honest and informed assessment of the health of the Company the ability of the directors—who were themselves up for re-election—to properly and effectively oversee the Company, and whether the Board's stewardship of the Company warranted the proposed amendments to the Company's 2020 Incentive Plan.

106.    The Company was directly harmed as these votes caused the Company to expend significant sums of money on benefits for the culpable directors and officers and permitted the culpable directors and officers to continue their wrongful conduct at the Company's expense.

### G.  Defendant Malik's Insider Sales

107.    According to a series of Form 4 Disclosures filed between June 13, 2024 and September 12, 2024, Malik sold $10,643,805 worth of his personally held Viatris stock while in possession of material non-public information. When these stock sales occurred, the truth about the conditions at the Indore Facility, the FDA's actions, and the impact those actions would have on the Company's revenues had not yet been made public. As such, when Malik made his sales,

the price of Viatris' stock was artificially inflated as a result of the false and misleading statements and omissions the Individual Defendants were disseminating.

108.    Further, all of Malik's sales occurred around the time of the FDA's June 14 to 26, 2024 inspection of the Indore Facility, when the Company would have been provided with the FDA's negative findings and when the Company attempted to provide what was to ultimately be a fruitless remediation plan. That so many large sales of stock occurred within the immediate vicinity of significant regulatory action is at the very least, suspicious.

## H.  The Truth Emerges

109.    On February 27, 2025, Viatris issued a press release disclosing that the FDA's import ban applied to lenalidomide and that neither lenalidomide nor any other product manufactured at the Indore Facility would be granted an exemption from the ban. Further, the press release revealed that the issues discovered at the Indore Facility would cause a negative impact on 2025 revenue and operating earnings amounting to approximately $500 million and $385 respectively, caused in significant part by the import ban on lenalidomide. The press release stated in part:

> Following an inspection of Viatris' oral finished dose manufacturing facility in Indore, India, in June 2024 the Company received a warning letter and import alert from the U.S. Food and Drug Administration (FDA) in December 2024. The import alert affects 11 actively distributed products, including lenalidomide and everolimus. The FDA made exceptions, subject to certain conditions, for four products based on shortage concerns. Following recently concluded interactions with the FDA regarding potential additional product exceptions, the Company currently does not expect any additional product exceptions to be granted.

> While product continues to be shipped from the Indore facility to markets outside the U.S., the Company currently anticipates some impact in other markets, including to parts of its ARV business in Emerging Markets and to select generic products in Europe. The Company currently estimates the negative impact on 2025 total revenues to be approximately $500 million and to 2025 adjusted EBITDA to be approximately $385 million.

110.    On the same day, Viatris filed with the SEC its annual report on Form 10-K for the

year ending December 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by Smith, Higgins, Cornwell, Dillon, Finney, Groothuis, Kilts, Korman, Malik, Mark, Parrish, and Coelho.

111.	The 2024 10-K included much of the same information regarding the Import Alert's impact as had been disclosed in the February 27, 2025 press release, stating in part:

> Following an inspection by the FDA at our oral finished dose manufacturing facility in Indore, India in 2024, the FDA has issued a warning letter, and an import alert related to this facility. The import alert affects 11 actively distributed products that will no longer be accepted into the U.S. until the warning letter is lifted. It makes exceptions, subject to certain conditions, for four products based on shortage concerns. Following recently concluded discussions with the FDA, the Company does not expect additional product exceptions to be granted by the FDA.

> \*	\*	\*

> While product continues to be shipped from the Indore facility to markets outside the U.S., some impact in other markets, including the ARV business in Emerging Markets and select generic products in Europe, is anticipated. The Company currently estimates the negative impact to 2025 total revenues to be approximately $500 million and to 2025 earnings from operations to be approximately $385 million.

112.	The 2024 10-K also described the consequences of the FDA's action in response to the violations found at the Indore Facility, stating in part:

> [I]n December 2024 the FDA issued a warning letter and import alert related to our oral finished dose manufacturing facility in Indore, India. The warning letter and import alert restrict our ability to distribute certain products into the U.S. and have also negatively impacted our ability to sell products made at this facility to customers in other regions. We currently expect a negative impact from the Indore actions on our financial condition, results of operations and cash flows in fiscal year 2025, and, if we are unable to resolve any such observations and address regulatory concerns in a timely fashion, our business, financial condition, results of operations, cash flows, ability to pay dividends or repurchase shares, and/or stock price could be materially adversely affected in 2025 as well as future periods.

> \*	\*	\*

> Negative publicity related to the receipt of a warning letter, import alert, or similar restrictions from the FDA or other regulatory authorities, such as the recent restrictions at our Indore facility, have damaged and could continue to damage our reputation among customers, lead customers to seek other suppliers of our products, or lead to additional inquiries from other regulatory authorities.

*    *    *

In addition, actual or alleged quality deficiencies in the products which we or our suppliers provide, or at our or their manufacturing facilities, including with respect to the recent warning letter and import alert at our Indore facility, have in the past and could in the future adversely impact our manufacturing and supply capabilities, cause supply interruptions, or lead to voluntary market withdrawals or product recalls.

113. During an earnings call held the same day, Smith disclosed further information concerning the FDA's inspection. Specifically, Smith disclosed that no other products would be granted exceptions as previously suggested, and that the headwinds in 2025 from the FDA's Warning Letter would be significant:

[We r]eceived a warning letter and import alert from the FDA at the end of December. The import alert affects 11 actively distributed products in the U.S., including lenalidomide.

The FDA made exceptions subject to certain conditions for 4 products based on shortage concerns. We recently finished interactions with the FDA about potential additional product exceptions, and we do not expect any additional exceptions will be granted at this time.

While product continues to be shipped from the facility to markets outside the U.S., we currently anticipate some impact on other markets, including parts of our ARV business and emerging markets and to select generic products in Europe. We currently estimate the negative impact on 2025 total revenues to be approximately $500 million and on 2025 adjusted EBITDA to be approximately $385 million.

114. During the call, Mistras also disclosed the substantial impact the import ban on lenalidomide would have on the Company's finances, stating in part:

We estimate an impact of approximately $500 million to 2025 total revenue and $385 million to adjusted EBITDA. This includes estimated penalties and supply disruptions of approximately $100 million, which we believe are mostly short-term in nature.

Lenalidomide, which after discussions with the FDA was not granted an exception, is the largest product impacted and represents approximately 40% of the total revenue impact and 50% of the total adjusted EBITDA impact given its margin profile.

115. During the question-and-answer portion of the call, Smith and Mistras responded to multiple questions regarding the Company's prior disclosures concerning the Warning Letter

36

and its impact on the Company's financial projections, engaging in the following interactions:

[Christopher Thomas Schott – JPMorgan Chase & Co.]: [C]an you just walk through a little bit when we think about the year-over-year step down in gross margins how much of that is coming from Indore and how much of that is coming from some of the factors that you cited?

[Mistras]: And to your question, Chris, around gross margin. There were a couple of components, as I mentioned, that we're factoring into the step-down. The largest component is Indore. Just given the high-margin nature of both the penalties as well as lenalidomide, the margin impact of Indore is about – kind of close to 80% margin. And then in addition to that, we just have normal kind of base business price erosion and increase in some product supply cost. And that has been offset with kind of benefits from just ongoing segment mix in our business.

*     *     *

[Jason Matthew Gerberry – BofA Securities]: So just for me, maybe I missed this, but why does the Indore facility issues have an impact on revenues outside the United States?

[Scott Andrew Smith]: So just on the first question, I think when you get a situation like Indore and warning letter and an active remediation that's ongoing right now, that active remediation sometimes can cause you to have a pause in manufacturing, supply issues in certain cases. Even though the product can go into Europe, there might be shortages of certain products, as we work through that plan and remediate.

We look for alternate sources of products while we're doing the remediation. So you can see some shortages with some products, but certainly not across the board, and it's very specific to product and location. But it has to do with the remediation of the facility. And again, we've got a network of facilities here from a manufacturing perspective, 26 globally, and we look for alternate sources when we have a shutdown for remediation or a slowdown for remediation like we do at Indore.

116.    Also during the question-and-answer portion of the call, Umer Raffat of Evercore ESI Institutional Equities challenged Smith and Mistras on the Individual Defendants' prior public statements regarding the Warning Letter and Import Alert, particularly with regard to the fact that lenalidomide had not been disclosed as a product covered by the import ban at the January 14, 2025 J.P. Morgan Healthcare Conference:

[Umer Raffat – Evercore ESI Institutional Equities]: First, Scott, Doretta, for you, at the conference in January, you guys talked about – for the Indore warning letter, you guys mentioned it's 11 products and most – and 4 of the 11 were exempt and

more could get exempt. So most folks listening in just assumed, you know what, hundreds of products, 11-100 of products in this company, 11 of them, so probably not so much. But the top of EBITDA hit we learned about today, considering also that you knew generic Revlimid was one of them, I'm just curious about the thought process around how you guys communicated that to investors previously.

[Scott Andrew Smith]: Yeah. So relative to disclosure, JPMorgan, it was a very dynamic situation at that time. There were some products which were excluded, others in which we had agreement from the FDA that we could go ahead and ask for exclusion and put our case together, why. So we were unsure exactly what that would look like. We were also exploring alternate forms of lenalidomide from other companies to help fill that shortage gap. So it was a very dynamic situation at that time.

We didn't even have a good view on exactly whether lenalidomide will be excluded or not until just a few days ago. So it's been very dynamic. We thought we had a great case because of the importance of the medication. It just did not materialize. And so, for me, JPMorgan to start to say, well, this is this product and not that product without being able to give the whole picture, I think, gets to our credibility. What was really concerning to me was to be accurate, to be credible to when I understood what exactly that list would look like and what exactly the impacts would look like that I could share that.

And I think it's only been in the last couple of days that it's been very clear to us what the U.S. and non-U.S. impacts are, including lenalidomide. I think the distortion that you see in terms of the magnitude from a revenue and EBITDA perspective is because specifically of lenalidomide and the profit profile of that particular product.

117. These disclosures, which were made by, or with the direct knowledge of, the Individual Defendants, were shocking to the investment community as they were in direct contrast to statements the Company made during the Relevant Period. Specifically, up until these disclosures were made, the Individual Defendants had: (i) not provided specific details as to the issues occurring at the Indore Facility, or how long the Company was aware of the issues; (ii) not provided a specific date in which the FDA inspection had occurred; (iii) given the impression that Viatris would be able to secure additional exceptions to the products on the import ban list; (iv) failed to provide details on the significance of the products included in the Import Ban (particularly with regard to lenalidomide), and (v) downplayed the extent to which the Warning Letter and resulting Import Ban would have a negative impact on the Company's finances, having stated

38

merely that the FDA action caused a "minor headwind." As a result, the disclosures portrayed a much bleaker picture of Viatris' prospects than the investment community had been led to believe over the past six months.

118.    As a result of these revelations, the price of Viatris' stock dropped significantly, falling from $11.24 per share on February 26, 2025 to $9.53 per share on February 27, 2025. This represented a decline of approximately 15.21% in the span of single day.

119.    Further, in the wake of these revelations, analysts began to lower their price targets for Viatris. For example, on February 27, 2025, an analyst at J.P. Morgan stated in part:

> Overall, 2025 guidance came in below expectations largely due to the company's Indore manufacturing plant warning letter, which is particularly impacting Revlimid [i.e., generic Revlimid or lenalidomide] sales. While VTRS had talked about this warning letter at the JPMorgan Healthcare Conference, the size of the impact is larger than we/the Street expected and we see Indore as a setback for the VTRS story (as the company had been posting solid/stable results over the past year). Elsewhere, VTRS's business is largely trending in-line with our expectations and we exit today's update lowering our 2025/2026 estimates.

120.    The J.P. Morgan analyst also cited the impact of the Indore Facility's failed inspection, stating:

> Indore impact bigger than expected and could take time to resolve. VTRS is expecting the import restrictions at Indore to reduce revenues by $500mm and EBITDA by $385mm this year. Revlimid is driving ~50% of this impact with VTRS estimating a $200mm revenue/$190mm EBITDA headwind from this product . . . VTRS is also expecting a $75mm impact in Europe and a $125mm impact in Emerging Markets . . . VTRS is working on remediating the plant, although this could take some time (mgmt. hoping for an FDA inspection in late 2025/2026) and we would not be surprised for this issue to persist into 2026.

121.    On the same day, a Jefferies analyst described the impact of the FDA's actions as "much worse than expected" stating in part:

> The Indore impact was much worse than feared[.] We are not surprised to see shares down in pre-market. We expect shares to be rangebound NT [near term] amidst Indore uncertainty. . . .
>
> 2025 guidance came in below as expected, but Indore impact of $500M and $385M on rev/EBITDA was much worse than we thought. Viatris issued a widely

expected below-consensus guide given 1) 2-3% FX headwinds and 2) the Indore facility shutdown. However, the Indore impact came in much worse than expected so we think that will be the primary focus post the print.

*        *        *

[T]he Indore impact for 2025 was much worse than we thought, which will be the primary driver of the stock post 4Q as we think the update overshadows underlying stability in the business  [W]ith the key positive catalyst (a repo announcement) overshadowed by negative news, we think shares could be pressured in the NT.

122. In another report, Morningstar expressed shock at the significance of the headwinds facing the Company due to the FDA action, stating in part:

> Headwinds from facility inspections in Indore, India, were revealed at a conference in January but look much more significant than we had originally anticipated. The import alert affects seven products mainly distributed in the US and is to create $500 million sales and $385 million EBITDA headwinds for 2025. Importantly, lenalidomide is included in the seven impacted products and is responsible for a majority of the headwinds. This was especially discouraging since 2025 was the last full year that Viatris, along with other key generic manufacturers, would have enjoyed meaningful contributions from the drug before additional competition is expected starting in 2026. The profit impact is also disappointing since the firm's consolidated EBITDA margin of 35% (average of the past three years) is likely to see meaningful headwinds given that the margin impact of the facility looks to be close to 80%.

> 2025 full-year guidance of $13.8 billion in revenue and $2.19 EPS, both at midpoint fall short of our original assumptions by 5% and almost 18%, respectively.

## V.  **DAMAGES TO VIATRIS**

### A. Costs Incurred and Expected in the Securities Class Action

123. On April 4, 2025, a Viatris stockholder filed a federal securities class action in the in this Court under the caption *Quinn v. Viatris, Inc. et al.*, Case No. 2:25-cv-00466 (W.D. Pa.) (the "Securities Class Action"). Viatris, Smith, and Mistras are all defendants in the Securities Class Action.

124. As a result of the Individual Defendants' misconduct, Viatris now faces significant defense costs for certain officers and the Company including escalating discovery, expert, and motion-practice related expenses, indemnification and advancement payments, and the risk of

substantial settlement or judgment exposure.

125.    The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

126.    These expenditures would not have been incurred absent the Individual Defendants' breaches of fiduciary duty, oversight failures, and misleading public statements.

### B.  Additional Damages to the Company

127.    To date, as a result of the Individual Defendants' misconduct, Viatris has been and will continue to be forced to expend millions of dollars. Such losses include, but are not limited to: legal and other costs incurred in connection with being named as a defendant in the Securities Class Action, including the defense and settlement of, or judgment in, the litigation; costs incurred with respect to implementing remediation efforts at the Indore Facility; the approximately $500 million negative impact to 2025 total revenues and approximately $385 million negative impact to 2025 earnings as a result of the FDA Warning Letter; costs incurred with high-level personnel replacement at the Indore Facility; and costs incurred in connection with the lavish and unjustified compensation and benefits paid to Individual Defendants while they were actively breaching their fiduciary duties to the Company.

128.    Moreover, these actions have irreparably damaged Viatris' corporate image and goodwill. For at least the foreseeable future, Viatris will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Viatris' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VI.    <u>CORPORATE GOVERNANCE</u>

129.    By reason of their positions as officers and/or directors of Viatris and because of their ability to control the business and corporate affairs of Viatris, the Individual Defendants owed

41

and owe Viatris and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Viatris in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Viatris and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

130.    The Individual Defendants, because of their positions of control and authority as directors and officers of Viatris, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

131.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on NASDAQ, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Viatris' financial condition, operations, products, internal controls, and business prospects.

132.    In addition, the Individual Defendants had a duty to cause Viatris to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Viatris' management, policies, and internal controls.

133.    At all times relevant hereto, the Individual Defendants were the agents of each other and Viatris and were at all relevant times acting within the course and scope of such agency.

134.    The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Viatris.

42

**A. The Individual Defendants' Duties Under The Company's Code of Business Conduct and Ethics**

135.     Viatris' Code of Business Conduct and Ethics ("Code of Conduct") applies to "all Viatris directors, officers, and employees."

136.     The Code of Conduct requires the reporting of any violation of the Code of Conduct to an immediate supervisor, Human Relations Business Partner, the Legal Department, or the Compliance Department.

137.     The Code of Conduct discusses the importance of complete, truthful, and accurate recordkeeping, stating:

> All Viatris personnel must comply with all established internal controls at all times. We must accurately enter all assets, liabilities, revenues and expenses of Viatris in the company's regular books, records and other standard financial documents. We are all required to record and report all data and information accurately and honestly. This applies to every business record or document that you prepare or contribute to as part of a team.

138.     The Code of Conduct prohibits making false statements or false claims to government entities and requires compliance with all relevant laws, stating:

> • Many laws prohibit making false statements or false claims to government officials and entities. There potentially can be severe civil and criminal penalties, both for you personally and for Viatris, if you violate these laws.
>
> • If you prepare or contribute to any business record, or represent or certify to the accuracy of the information contained in such records, you must be diligent in assuring their accuracy and complete integrity.
>
> • All Viatris personnel must comply with all established internal controls at all times. We must accurately enter all assets, liabilities, revenues and expenses of Viatris in the company's regular books, records and other standard financial documents. These books, records and documents also must accurately reflect and properly describe the transactions they record.

139.     The Code of Conduct requires full, fair, accurate, truthful, and timely public disclosures:

> Viatris is committed to delivering accurate information when communicating with the investment community, regulators, the media and other interested parties, and

43

to making full, fair, accurate, truthful, timely and understandable disclosures in all public reports and filings made pursuant to law or regulation.  We are responsible for ensuring that information which will or may be part of a financial statement or related filing is accurate, complete and meets all legal requirements.

140.    Defendant Smith, as the CEO of Viatris, had additional duties under the Company's Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Corporate Controller ("Code of Ethics") including, to: (i) engage in honest and ethical conduct; (ii) endeavor to make, and to promote the making by others of, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company; (iii) comply with applicable governmental laws, rules, and regulations; and (iv) report promptly any violations of the Code of Ethics to a responsible member of management.

## B.  Duties for Audit Committee Members

141.    The Audit Committee sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, the Company's risk management practices and policies; the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; and the effectiveness and performance of the Company's internal audit function.

142.    According to the Audit Committee Charter, Audit Committee members are required to assist the Board in fulfilling its fiduciary responsibilities, in particular through the Committee's exercise of oversight of:

1.  the integrity of the Company's financial statements and its accounting and financial reporting processes;

2.  the effectiveness of the Company's internal control over financial reporting . . .

5.  the Company's processes and procedures relating to risk assessment and risk management of financial and disclosure control-related, as well as reporting-related, matters . . . ; and

7. the Company's compliance with applicable legal and regulatory requirements (including U.S. federal securities laws) regarding the preceding matters.

143. The Company's Audit Committee Charter also assigns the following duties and responsibilities:

**(3) With respect to financial reporting and internal controls:**

(a) Review the annual audited financial statements and quarterly financial statements, and financial information to be included in related public releases and SEC filings with management (including the Internal Audit Group) and the independent auditor. Such review shall include (1) the Company's Quarterly Reports on Form 10-Q and Annual Report on Form 10-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to their filing with the SEC; (2) any related GAAP and non-GAAP annual and quarterly financial information to be included in earnings press releases, including pro-forma or adjusted non-GAAP information, and other related financial information or earnings guidance contained therein; . . .; (4) analyses prepared by management (including Internal Audit) and/or the independent auditor setting forth significant accounting and/or financial reporting issues, judgments or estimates made in connection with the preparation of the Company's financial statements; (5) the status of significant pending litigation, taxation matters, and other areas of oversight as may be appropriate; . . .; (7) any significant financial and accounting risk exposures and the steps management has taken to mitigate and control them . . .; (8) the impacts of any new rules, standards, or regulatory guidance that pertain to accounting, auditing, and/or financial reporting, including but not limited to discussions, as needed, with the independent auditor, management, and external advisors with respect to the Company's implementation progress regarding any such new rules, standards, or regulatory guidance;

(b) Review with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the quality and adequacy of the Company's internal control over financial reporting, including (1) management's report on the effectiveness of the Company's internal control over financial reporting; (2) the independent auditor's report on its audit of the effectiveness of the Company's internal control over financial reporting; and (3) the Company's disclosure controls and procedures, including their effectiveness;

(c) Review, including reviewing and discussing with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the Company's processes and procedures with respect to risk assessment and

risk management of financial and disclosure control-related, as well as reporting-related, matters;

*     *     *

**(4) With respect to reporting by and recommendation from the Committee:**

(a) Provide at least one report annually to the Board describing the Committee's (1) plans for carrying out the Committee's duties and responsibilities; (2) appraisal of the financial reporting processes and internal control over financial reporting. . . .

(b) Make recommendations to the Board as to whether the Company's audited financial statements should be included in its annual reports on Form 10-K on the basis of (1) the Committee's review of audited financial statements; (2) its review with management regarding such audited financial statements; . . . .

(c) Report to the Board that the Committee has reviewed the Company's quarterly reports on Form 10-Q with management and the Company's independent auditor;

*     *     *

**(5) With respect to other Audit Committee Duties:**

*     *     *

(b) Approve Company procedures for the receipt, retention, and treatment of complaints regarding accounting, internal accounting controls, or auditing matters, including procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, and regularly review any reports of such nature[.]

**C. Duties of Governance and Nominating Committee Members**

144.    The Charter of the Governance and Nominating Committee sets forth additional duties for its members, including obligations relating to oversight over the development and adequacy of the Corporate Governance Principles, including, recommending to the Board corporate governance principles applicable to the Company, and reviewing and making recommendations to the Board for revisions to the Corporate Governance Principles at least annually.

46

### D. Duties of Compliance and Risk Oversight Committee Members

145.    The members of the Compliance and Risk Oversight Committee are required to oversee the Company's enterprise risk management framework.

146.    According to its Charter, Members of the Compliance and Risk Oversight Committee have a responsibility to, among other things: (i) oversee the Company's enterprise risk management framework; (ii) oversee the Chief Compliance Officer's implementation of the Company's Corporate Compliance Program; and (iii) report to the Board with respect to the status of the Corporate Compliance Program, and make recommendations to the Board and/or management with respect to the formulation or re-formulation of, and the implementation, maintenance and monitoring of, the Corporate Compliance Program, the Code Conduct, and significant related global policies designed to support and promote compliance with Company requirements, and legal rules and regulations.

147.    The Compliance and Risk Oversight Committee Charter also states, in relevant part:

In connection with its oversight responsibilities and its advice and recommendations to the Board, the Committee shall, in addition to any other duties or responsibilities the Board may from time-to-time delegate to the Committee:

(a) Review the enterprise risk framework, infrastructure, and controls implemented by management to help identify, assess, manage and monitor the Company's material risks;

(b) Review the Company's efforts to foster a culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation;

(c) Review significant global compliance-related policies implementing the Company's Code of Business Conduct and Ethics, or related to the operations of the Company's business, and its mode or methods of doing business, including, for example, policies relating to pricing and/or commercialization of the Company's products and services;

(d) Review metrics used by management or requested by the Committee to provide insight into the status and efficacy of the Compliance Program, including the Company's global compliance systems and organization;

(e) Review reports of significant actual and alleged violations of the Code of

47

Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations, including all reports of significant alleged violations by "executive officers," as that term is defined in Rule 3b-7 promulgated under the Securities Exchange Act of 1934, and any related disciplinary actions;

(f) Review checks and balances implemented by the Company designed to support and promote compliance with approved corporate policies, legal rules, and regulations;

(g) Review standards and procedures implemented by the Company designed to help reduce the potential for violation of corporate policies and legal rules and regulations, and the communication of such standards and procedures to employees and external agents as appropriate;

(h) Review results of audits and assessments by and on behalf of the Corporate Compliance Group and, as appropriate, reports by Internal Audit, other global audit functions, and external consultants relating to matters within the scope of this Charter;

*      *      *

(m) At its discretion, and no less than semi-annually, consult with the Chairs of the other Board Committees to discuss risk-related matters delegated to those Committees and the Company's enterprise risk management framework, and report the results of those discussions to the full Board;

(n) Periodically report to the Board on the status and efficacy of (i) the Company's enterprise risk management framework, including structure and implementation, (ii) the most significant risks and how these are managed, and recommendations, if any, that any risk-related oversight responsibilities should be delegated to, or reviewed by, other committees of the Board, (iii) the Compliance Program and (iv) the Committee's meetings, actions and recommendations[.]

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

148.    Plaintiffs bring this action derivatively and for the benefit of Viatris to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Viatris, as well as the aiding and abetting thereof.

149.    Viatris is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

150. Plaintiffs are, and have been at all relevant times, stockholders of Viatris. Plaintiffs will adequately and fairly represent the interests of Viatris in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

151. Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused. The Board is neither disinterested nor independent.

152. At the time of filing of this Consolidated Complaint, Viatris' 13-member board consisted of Individual Defendants Higgins, Parrish, Cornwell, Dillon, Finney, Groothuis, Kilts, Mark, Smith, and Coelho (collectively, the "Director Defendants"), together with Non-Parties D'Amelio, Severino, and Simmons.

153. Plaintiffs are required to show that a majority of the Board cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least seven of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

154. Each of the Director Defendants was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

155. The Director Defendants either knew or should have known of the false and

misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

156.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

157.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

## A.  Demand is Excused as to Defendant Smith

158.    Defendant Smith is Viatris' CEO since April 1, 2023 and a Director since December 2022. Smith therefore is not independent. As an employee of Viatris, the Company provides Smith with his principal occupation from which he receives substantial compensation. According to the 2025 Proxy, Defendant Smith received $14,759,379 in total compensation from the Company in 2024. Furthermore, Smith beneficially owns 314,807 shares of Viatris common stock, with a market value of approximately $3,245,660. Indeed, Viatris' 2025 Proxy does not list Smith as an independent director.

159.    Smith is named as a Defendant in the Securities Class Action. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

160.    Defendant Smith cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Smith faces a substantial likelihood of liability

50

therefor.

161.   Smith benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

162.   As a director of Viatris, Smith was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

163.   For these reasons, Smith faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

**B.  Demand is Excused as to Defendant Higgins**

164.   Defendant Higgins cannot be disinterested for purposes of demand because she personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Higgins faces a substantial likelihood of liability therefor.

165.   Higgins benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

166.   As a director of Viatris, Higgins was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects;

(2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

167. For these reasons, Higgins faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to her.

### C. Demand is Excused as to Defendant Cornwell

168. Defendant Cornwell cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Cornwell faces a substantial likelihood of liability therefor.

169. Cornwell benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

170. Cornwell, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Cornwell utterly failed to perform these essential duties.

171. Cornwell, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Cornwell utterly failed to perform these essential duties.

172. As a director of Viatris, Cornwell was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and

take action when presented with red flags regarding misconduct or the lack of internal controls.

173. For these reasons, Higgins faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

### D. Demand is Excused as to Defendant Dillon

174. Defendant Dillon cannot be disinterested for purposes of demand because she personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Dillon faces a substantial likelihood of liability therefor.

175. Dillon benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

176. Dillon, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Dillon utterly failed to perform these essential duties.

177. Dillon, as Chair of the Governance and Sustainability Committee, had duties regarding the implementation and effectiveness of Viatris' Corporate Governance Principles. Dillon utterly failed to perform these essential duties.

178. As a director of Viatris, Dillon was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

179. For these reasons, Dillon faces a substantial likelihood of liability, is not

disinterested or independent, and thus demand is excused as to her.

### E. Demand is Excused as to Defendant Finney

180. Defendant Finney cannot be disinterested for purposes of demand because she personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Finney faces a substantial likelihood of liability therefor.

181. Finney benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

182. Finney, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Finney utterly failed to perform these essential duties.

183. As a director of Viatris, Finney was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

184. For these reasons, Finney faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to her.

### F. Demand is Excused as to Defendant Groothuis

185. Defendant Groothuis cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Groothuis faces a substantial likelihood of liability

therefor.

186. Groothuis benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

187. Groothuis, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Groothuis utterly failed to perform these essential duties.

188. Groothuis, as a member of the Governance and Sustainability Committee, had duties regarding the implementation and effectiveness of Viatris' Corporate Governance Principles. Groothuis utterly failed to perform these essential duties.

189. As a director of Viatris, Groothuis was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

175. For these reasons, Groothuis faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

### G. Demand is Excused as to Defendant Kilts

190. Defendant Kilts cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Kilts faces a substantial likelihood of liability therefor.

191. Kilts benefitted from the violation of Section 14(a) of the Exchange Act pled herein

by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

192.    As a director of Viatris, Groothuis was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

193.    For these reasons, Kilts faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

### H.  Demand is Excused as to Defendant Parrish

194.    Defendant Parrish cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Parrish faces a substantial likelihood of liability therefor.

195.    Parrish benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

196.    Parrish, as chair of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Parrish utterly failed to perform these essential duties.

197.    Parrish, as a member of the Governance and Sustainability Committee, had duties regarding the implementation and effectiveness of Viatris' Corporate Governance Principles.

Parrish utterly failed to perform these essential duties.

198.    As a director of Viatris, Groothuis was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

199.    For these reasons, Parrish faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

### I.    Demand is Excused as to Defendant Mark

200.    Defendant Mark cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Mark faces a substantial likelihood of liability therefor.

201.    Mark benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

202.    Mark, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Mark utterly failed to perform these essential duties.

203.    Mark, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Mark utterly failed to perform these essential duties.

204.    As a director of Viatris, Mark was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

205.    For these reasons, Mark faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him.

### J.    Demand is Excused as to Defendant Coelho

206.    Defendant Coelho cannot be disinterested for purposes of demand because he personally approved and signed Viatris' 2023 and 2024 10-Ks, both of which contained materially false and misleading statements. As a result, Coelho faces a substantial likelihood of liability therefor.

207.    Coelho benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Viatris Board through the false and misleading statements and material omissions in the 2024 Proxy.

208.    Coelho, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Coelho utterly failed to perform these essential duties.

209.    As a director of Viatris, Coelho was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects;

(2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

210. For these reasons, Coelho faces a substantial likelihood of liability, is not disinterested or independent, and thus demand is excused as to him..

### K. Other Factors Demonstrating That Demand Upon the Viatris Board is Excused

211. Viatris has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

212. The members of the Viatris Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

213. Publicly traded companies, such as Viatris, typically carry director & officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Viatris' damages.

## VIII.   <u>CLAIM I</u>

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

214. Plaintiffs incorporate by reference and reallege each and every allegation set forth above as if fully set forth herein.

215. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].”

216.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain “any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.” 17 C.F.R. §240.14a-9.

217.    Under the direction and watch of the Director-Defendants, the 2024 Proxys failed to disclose any information about the issues impacting the Company’s Indore Facility or the subsequent FDA inspection and findings. Specifically, they failed to disclose, inter alia, that: (i) the Company’s Indore Facility had been suffering from significant health, safety, and operational issues well before the FDA’s June 2024 inspection, (ii) in June of 2024, the FDA had conducted an inspection of the Company’s Indore Facility, (iii) during that inspection, the FDA uncovered multiple material safety violations, (iv) in July of 2024, Viatris submitted responses and proposed remediation plans to the FDA, and (v) given the nature and scope of the violations, there was a material chance that the Company’s operations and revenues would be negatively impacted—including with respect to its lenalidomide drug.

218.    Moreover, the Proxy Statement was false and misleading when it discussed the Company’s adherence to specific governance policies and procedures, including the Code of Conduct and specific Board committee charters, due to the Individual Defendants’ failures to abide

60

by them and their engagement in the scheme to issue false and misleading statements and omissions of material facts.

219.    The 2024 Proxy's omissions were material to shareholders' votes on: (i) the reelection of directors responsible for compliance/disclosure; (ii) executive compensation; and (iii) a 49,000,000-share increase under the 2020 Incentive Plan.

220.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the 2024 Proxys was materially false and misleading. The misrepresentations and omissions were material to stockholders in voting on the matters set forth for shareholder determination in the Proxys, including but not limited to, election of directors, approval of certain Company's executive's compensation, and approval of an amendment to the Company's 2020 Incentive Plan. Had stockholders been aware that the Company was facing down a significant failed FDA inspection, they likely would have been more hesitant to vote to bestow lucrative benefits on many of the same directors and officers who were responsible for wrongdoing described herein.

221.    Yet, because the truth was concealed through the false and misleading statements and omissions in the 2024 Proxy Statement, stockholders voted to, among other things, reelect or elect Cornwell, Dillon, Finney, Higgins, Kilts, Groothuis, Mark, Parrish, Smith, and Coelho to the Board, thus allowing them to continue to breach their fiduciary duties to Viatris.

222.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

223.    Plaintiffs, on behalf of Viatris, have no adequate remedy at law.

## IX.    CLAIM II

### Against the Individual Defendants for Violations of 21D of the Exchange Act

224.    The conduct of the Individual Defendants, as described herein, has exposed the

61

Company to significant liability under various federal securities laws by their misconduct.

225.     Viatris is named as a defendant in a related securities class action lawsuit that alleges and asserts claims arising under the federal securities laws.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

226.     If Viatris is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct.

227.     The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

228.     As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Viatris' general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

229.     The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

230.     The Individual Defendants have damaged the Company and are liable to the Company for contribution.

## X.     CLAIM III

**Against the Individual Defendants for Breach of Fiduciary Duties**

231.     Plaintiffs incorporate by reference and reallege each allegation contained above, as though fully set forth herein.

232. The Individual Defendants owed and owe fiduciary duties to Viatris. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Viatris the highest obligation of good faith and loyalty in the administration of Viatris' affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Viatris alleged herein.

233. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

234. The Individual Defendants each violated their fiduciary duties to Viatris and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Viatris has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

235. In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Corporate Governance Principles, Code of Conduct and, and the charters of the various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

236.    Further, in breach of his fiduciary duties, Malik engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

237.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

238.    Plaintiffs on behalf of Viatris have no adequate remedy at law.

## XI.    **CLAIM IV**

### **Against the Individual Defendants for Aiding and Abetting**

239.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

240.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

241.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

242.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

243.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

244.    Plaintiffs on behalf of Viatris have no adequate remedy at law.

## XII.    <u>CLAIM V</u>

### Against the Individual Defendants for Waste of Corporate Assets

245.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

246.    The wrongful conduct alleged herein was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and on-going harm to the Company.

247.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) paying excessive compensation to certain of its directors and officers; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending Viatris and certain of its officers against the Securities Class Action.

248.    Plaintiff, as a stockholder and representative of Viatris, seeks restitution from the Individual Defendants, and each of them, for their wrongful conduct and fiduciary breaches.

249.    Plaintiff, on behalf of Viatris, has no adequate remedy at law.

## XIII.    <u>CLAIM VI</u>

### Against the Individual Defendants for Unjust Enrichment

250.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

251.    By their wrongful acts and omissions, and violations of law, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Viatris.

252.    The Individual Defendants either benefited financially from the improper conduct and their making lucrative insider sales, or received bonuses, stock options, or similar compensation from Viatris that was tied to the performance or artificially inflated valuation of Viatris, or received compensation that was unjust in light of the Individual Defendants' bad faith

conduct.

253.    Plaintiff, as shareholder and representative of Viatris, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, including from insider transactions, salaries, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and breaches of fiduciary duty.

254.    Plaintiffs, on behalf of Viatris, have no adequate remedy at law.

## XIV.    CLAIM VII

### Derivative *Brophy* Claim Against The Insider Seller Defendant

255.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

256.    As directors and officers of Viatris, the Insider Seller Defendant owed fiduciary duties of loyalty and good faith to the Company.

257.    The Insider Seller Defendant sold Viatris stock while in possession of material nonpublic information that artificially inflated the price of Viatris stock.    The Insider Seller Defendant possessed material adverse nonpublic information regarding the FDA's June 2024 observations, the inadequacy of the Company's July 2024 response, and the scope of the impending Warning Letter/Import Alert affecting lenalidomide when selling his stock. Upon information and belief, these trades were not executed pursuant to a pre-existing, good-faith Rule 10b5-1 plan adopted before the January–June 2024 red flags, or any such plan was modified or used opportunistically in proximity to those events).

258.    By selling Viatris stock while in the possession of material adverse nonpublic information that artificially inflated the price of Viatris stock, the Insider Seller Defendant exploited his position at Viatris and breached his fiduciary duties to Viatris. The Insider Seller

Defendant improperly benefited from his breaches of fiduciary duty and is liable to Viatris for his benefit therefrom.

Plaintiffs, on behalf of Viatris, have no adequate remedy at law.

XV.  **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in Viatris' favor against all Individual Defendants, as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of Viatris and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants violated §§14(a) and 21D of the Exchange Act;

(c) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Viatris;

(d) Directing Viatris to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight and monitoring;

(e) Ordering Board-level compliance reforms, including: (i) the creation of a Board Quality & Compliance Committee focused on cGMP/data-integrity; (ii) engaging an independent compliance monitor for 24 months; (iii) quarterly public reporting on remediation progress; and (iv) enhanced disclosure controls for FDA interactions;

(f) Ordering the Board to reformed its insider-trading policy to include enhanced blackout periods around inspections/remediation and mandatory pre-clearance for all Section 16 officers and directors);

(g) Order the Board to clawback incentive compensation tied to periods of misleading

67

disclosures and noncompliance.

(h) Determining and awarding to Viatris the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(i) Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(j) Awarding Viatris restitution from the Individual Defendants, and each of them;

(k) Awarding Plaintiffs, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(l) Granting such other and further relief as the Court may deem just and proper.

XVI.    **JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Date: February 27, 2026                 **WEISS LAW**

By: */s/ Mark D. Smilow*
David C. Katz (*Pro Hac Vice*)
Mark D. Smilow (*Pro Hac Vice*)
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Email: dkatz@weisslawllp.com
Email: msmilow@weisslawllp.com

*Co-Lead Counsel For Plaintiffs And Counsel For Plaintiff Jacob Scheiner*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Email: pkim@rosenlegal.com

68

Email: estone@rosenlegal.com

*Co-Lead Counsel For Plaintiffs and Counsel For Plaintiff Don Masters*

**STRASSBURGER    MCKENNA    GUTNICK    & GEFSKY**
David A. Strassburger
Jordan L. Strassburger
Four Gateway Center, Suite 2200
444 Liberty Avenue
Pittsburgh, PA 15222
Telephone: (412) 281-5423
Email: dstrassburger@smgglaw.com

*Co-Liaison Counsel For Plaintiffs and Counsel For Plaintiff Jacob Scheiner*

**LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**
James E. Hockenberry
1800 John F. Kennedy Boulevard
Suite 1500
Philadelphia, PA 19103
Telephone: (215) 717-0744
Email: jh@aussprunglaw.com

*Co-Liaison Counsel For Plaintiffs And Counsel For Plaintiff Don Masters*

**RIGRODSKY LAW, P.A.**
Vincent A. Licata
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3519
Email: vl@rl-legal.com

*Counsel For Plaintiff Portia McCollum*